THOMSON-HOUSTON ELECTRIC CO. v. NASSAU ELECTRIC R. CO. et al.

SAME v. BULLOCK ELECTRIC CO. et al.

(Circuit Court of Appeals, Second Circuit.   February 27, 1901.)

Nos. 81, 102.

1. PATENTS—INVENTION—ELECTRIC SWITCHES.

The Thomson patent, No. 283,167, for improvements in electric switches or commutators, as to claims 1 and 4, the essential feature of which is the use of a magnet to dissipate, or prevent the formation of, an arc between the separated parts of the conductor when an electric current is broken by means of a switch, for the purpose of preventing the burning of such parts, is void for lack of patentable invention. The influence of a magnet on the arc formed in a disconnected circuit was previously well known, and the result of preserving the contact points of an electric switch from injury by combining a magnet with such switch, which is the essence of the claims of the patent, is so much a part of the known result of its action that it cannot be claimed as a new discovery or render the combination patentable.

2. SAME.

The Thomson patent, No. 401,085, for a shield designed to retain the arc formed in breaking an electric circuit, by means of a switch, within

the field of a magnet, used, in combination with the switch, to rupture or dissipate such arc, and prevent the burning of the electrodes, and which, as described in claims 1 to 6 of the patent, consists in covering the poles of the magnet, or the electrodes, or both, with a coating of insulating material, such as enamel, is void for lack of patentable invention; being merely the application to a new device of well-known mechanical means of insulation to accomplish the old result of preventing the injurious escape of an electric current.

Appeal from the Circuit Court of the United States for the Eastern District of New York.

Appeal from the Circuit Court of the United States for the Southern District of New York.

The first-named suit, known in the litigation as the "Nassau Case," was brought in the circuit court for the Eastern district of New York to prevent the alleged infringement of claims 1 and 4 of letters patent No. 283,167, dated August 14, 1883, to Elihu Thomson, for an improvement in electric switches. The bill was dismissed for want of patentable novelty of the invention described in those claims. 98 Fed. 105. The second suit, known as the "Bullock Case," was brought in the circuit court for the Southern district of New York, and was based upon the alleged infringement of the same patent, No. 283,167, and of letters patent No. 401,085, dated April 9, 1889, to Elihu Thomson, for an improvement in electric arc-rupturing devices. The court followed, without discussion, the conclusions of Judge Thomas respecting the earlier patent, dismissed the bill as to that patent, and held that No. 401,085 was valid, and had been infringed as to six claims, and a decree was entered for the complainant accordingly. 101 Fed. 587. The complainant appeals from the decree of the circuit court for the Eastern district of New York, and each party appeals from the decree of the court for the Southern district.

F. H. Betts, for appellant Thomson-Houston Electric Co.

Clifton V. Edwards, for respondents Bullock and others.

W. H. Kenyon, for respondents Bullock and others and Nassau Electric R. Co. and Lorain Steel Co.

Before WALLACE, LACOMBE, and SHIPMAN, Circuit Judges.

SHIPMAN, Circuit Judge (after stating the facts as above). The object of the invention described in claims 1 and 4 of No. 283,167 was to increase the durability of electric switches, when, upon being opened to break circuits, an electric arc is formed across the switch contacts, with resultant injury to the switches. A switch is, in general terms, "a device for opening and closing a single circuit in some regular and systematic manner." The switch which is in ordinary commercial use "involves two stationary terminals connected to the opposite branches of a circuit, and a removable bridging piece inserted between such two terminals to complete the continuity of the circuit, or withdrawn therefrom to interrupt the circuit." This interruption is a frequent necessity, especially in the operation of trolley railways, where the current is large, and the amount of force employed must constantly be subject to change. Whenever the continuity of the circuit is interrupted by throwing open the bridge, an air gap is introduced, over which the current continues to flow until the air gap becomes too wide and makes too great resistance to the pressure of the current. This flow over the air gap is called an "electric arc," and is "mainly a stream of metallic vapor," which comes from the fusing and vaporizing of the contacts, or of the elec-

trodes; for an electric arc "is the source of an intense heat and light." The switches, being made of copper, are easily burned or melted, and the contact portions are left in a rough condition, which interferes with perfect contact when the switch is closed. To prevent this burning or fusing was the object of the invention. The remedy is shown in the specification, as follows:

"My invention relates to switch or commutator devices for breaking, changing, or shifting electric circuits, and more particularly to switches or commutators designed for use in connection with electric lighting systems, although it is not confined to devices used in such connection, but is intended to include electric switches or commutators generally, when used in combination with circuits designed to carry currents of considerable electro-motive force, or of sufficient electro-motive force to cause a tendency to the formation of electric arcs across the switch contacts on breaking circuit, or when used in connection with any other apparatus, such that there is a tendency to the formation of arcs or sparks at the switch or commutator surfaces. The object of my invention is to increase the durability of electric switches or commutators, and to prevent damage thereto from the causes mentioned. More specifically, my invention is designed to prevent damage to the commutator brushes and segments by the formation of arcs or sparks at the commutators of dynamo-electric machines, and likewise to lessen the tendency to short-circuiting of the armature coils by the residuary spark of rupture. To these ends, my invention consists in combining, with the contact surfaces or points for an electric switch or commutator, suitable means for producing a magnetic field in proximity to the contact surfaces; such, for instance, as a magnet whose poles are placed near to the said contact surfaces or points, so as to break, displace, or disperse any electric spark or arc that may form, or tend to form, at such contacts, said magnet acting for this purpose by virtue of the tendency of an arc or heated conductor to move out of or into a magnetic field, according to its direction. * * * Any desired form or construction of an electro-magnet may be employed, and said magnet may be applied in any desired way, provided it be suitably arranged to bring the attractive or repulsive action of a magnetic field to bear upon any spark, arc, or electric current that may pass, or tend to pass, at the time of breaking or commutation, so as to diffuse or displace the same. I have herein shown a magnet for producing or bringing a magnetic field to bear; but other means for producing or bringing to bear the desired magnetic influence may be employed, such, for instance, as a conductor forming the path of an electric current."

Claims 2 and 3 of the patent relate to the combination of a magnet with the commutator of a dynamo-electric machine, and are not involved in this suit. Claims 1 and 4 are as follows:

"(1) The combination, with an electric switch or commutator, of a magnet placed in proximity to the switch contacts, or to surfaces between which a spark or flash is liable to occur, substantially as and for the purpose set forth. * * * (4) The combination, with the contact points or surfaces in an electric switch or commutator, of suitable means for producing a magnetic field in proximity thereto, which field shall act, by its attractive or repulsive influence. to diffuse or displace any electric arc or current that may pass, or tend to pass, at the instant of break or commutation."

In the invention, Thomson made use of a law of nature; that is, a law of electro-magnetism which had long been known by scientists. For example, De La Rive published in 1846 as follows:

"Davy was the first who observed that a powerful magnet acts upon the voltaic arc as upon a movable conductor traversed by an electric current; it attracts and repels it, and this repulsion and attraction manifests itself by a change in the form of the arc. Even the action of the magnet may, as I have found, break the arc by too great an attraction or repulsion exerted

upon it, causing the communication which the transmitted particles establish between the electrodes to cease."

The appellees rightly assert that it had been common knowledge among electricians for years prior to 1883 that a magnet would act to deflect, displace, and even extinguish an electric arc. While a law of nature—the mere principle—is not patentable, the inventor of means by which the principle can be utilized may be entitled to a patent. The new application of the law by the described mechanical means to a new purpose, which affords a new and useful practical result, is patentable.

The complainant insists that the scientists before Thomson, who discovered the law which has been stated, had learned simply the effect of a magnetic field upon a voltaic arc between two broken pieces of wire, knew nothing of its utility in connection with the switch in commercial use, which is a modern structure, and that the mechanical application of the law to such a structure, which prolonged its life, created a new and useful result, and was patentable. It is probable that the scientists had not obtained their knowledge by experiments upon switches or devices in actual use, and we have no doubt that by the switch of the patent is meant one in commercial use, which is a device for opening and closing a circuit in a regular and systematic manner. The trouble, however, in finding that the extinguishment of the arc which arises from the opening of a commercial switch is a new purpose, arises from the fact that the interrupted circuit of the scientists was a crude switch, and, as appears from Mr. Daniell's published account, the current was of sufficient strength to create both light and heat to a painful degree. The case is not one of the ordinary kind in which laboratory experiments produce surmises or predictions of what may be done, but the knowledge which existed in 1883 was of what had been done by the action of a magnet upon a voltaic arc between the two ends of an interrupted conductor.

The next and main proposition of the appellant is one persuasively pressed both by counsel and experts, and is stated in this way: "In the present case, it was well known that an arc would be produced if an electric circuit was broken, and it was also well known that, if an arc was brought into the field of force of a magnet, such arc would be deflected, and finally extinguished." But Prof. Thomson's discovery was that, "by practically applying a magnet properly located in proximity to the contact points of an electric switch, the contact surfaces would be effectively preserved from the burning effects of the arc produced at those contact points when the circuit was broken by the electric switch." "What Prof. Thomson did was to make a new and improved structure or combination, viz. a switch whose contacts would remain permanently smooth and unroughened by being combined with a magnet, and he was enabled to make this new structure by discovering for the first time the capacity of a magnet to subserve that purpose. This is something much more specific and practical than the mere knowledge that arcs destroy electrodes, and that arcs stop their destructive work when they cease to be. * * * The new thing that Prof. Thomson 'found out' was that

a magnet, when combined with a switch structure (whose contacts must be smooth and clear), would modify an arc, even if of high potential, and push it across the surfaces so rapidly as to preserve their requirements as contacts." The preservation of the surfaces is said to arise from the fact that, in the patentee's structure, the magnet quickly elongated the arc, and caused its roots to so rapidly pass over the surfaces of the contact points that no one point supplied enough material to the arc to damage the surfaces. We do not suppose that the attention of the scientists was particularly called to the beneficial effect of the magnetic field upon contact surfaces, their attention being specially called to its effect upon the hot blazing arc, which they found to have been deflected, and even extinguished, with the result that its fusing power upon the copper conductors had been checked. They saw that the burning arc was turned way from the contact points, and, finally, if a sufficiently strong magnet was used, ceased to burn. The alleged new discovery of a preservative action upon contact points was not noted on paper, and, indeed, is not stated in the patent by Thomson, and is a more detailed statement of the beneficial results of the magnetic field than had been given. Instead of saying the electrodes are not fused, the experts say the contact points are kept smooth. The old scientists said that the magnetic field pulls the arc away from the electrodes and extinguishes it. The experts say, "Yes, and it pulls so rapidly, and scatters the arc so widely, that the contact surfaces are kept smooth, and are not fused." The alleged new discovery of Thomson is so much a part of the known result of the old law as not to deserve the name of a new discovery, or of a new result of Thomson's method of applying the magnet when a switch is opened. The theory of the divisibility of Davy's discovery of the effect of a magnetic field upon a voltaic arc which burns, from the alleged discovery of Thomson of the effect of a magnetic field upon the ends of the severed conductor between which the arc is burning, is not strong enough to bear the weight that the experts place upon it. If the patent was to be sustained, we should rather rest in its support upon the declaration that Thomson applied the law which the scientists observed, in laboratory experiments upon magnets and electric wires, to the switch of modern commercial use and efficiency, and made the experiments of practical utility.

Patent 401,085 is next to be considered. Mr. Bentley states the peculiarity of an electric arc of considerable length, and the consequent difficulty of breaking it, in substance as follows: The arc is an erratic and unstable flame, that darts and twists in all directions. Therefore the poles of the magnet must not be brought close to the switch contacts, lest the arc should come in contact with them in its erratic movement. The magnetic field must also be of sufficient extent to break the arc, or the switch and perhaps some other part of the apparatus would be burned. Therefore the arc must be "restricted in its range of play so that it cannot escape from the magnetic field, but is maintained therein, and compelled to submit itself to the dispersive action of the magnet." The result of this compulsory restriction is that a smaller magnet can be

placed in a diminished air gap. The patentee in his specification, after saying that his invention is applicable, not only to this arc-rupturing device in connection with the electrodes of lightning arresters and safety fuses, but also to an arc-rupturing device when it is desirable to effect this rupture by a device acting upon the arc itself, says that, to increase the efficiency of all subdivisions, his invention—

"Consists in the application of a shield or septum of insulating material between the opposed surfaces of the arc-rupturing device and the electrodes or conducting bodies between which the arc to be ruptured is formed, thereby preventing an arc from forming at any other portion of the electrodes or conductors than those directly subject to the arc-rupturing force, and permitting the arc-rupturing device, when of conducting material, to be applied, without danger of defective action, very closely to the electrodes. The protecting shield or septum may be of any desired material, and applied in a variety of ways, either to the electrodes or to the arc-rupturing devices, or to both, as may be desired. The arc-rupturing devices I have herein described, for the purpose of illustrating my invention, consist of a magnet applied to the arcing electrodes after the manner described in my prior patent, No. 321,464, of July 7, 1885. When my invention is applied to an arc-rupturing device consisting of a magnet properly arranged with reference to the electrodes across which the arc to be ruptured is formed, the interposed insulating septum or shield may be formed by coating or covering the poles or metallic portions of the magnet with enamel, rubber, or other insulating material, enamel being preferable on account of its incombustible nature. By this means discharges or arcs which might otherwise pass from the poles or electrodes placed in the magnetic field to the magnet pole, thereby escaping the action of the magnet in rupturing the same, are prevented. I find it in fact desirable to apply the insulating shield to all metal portions which are in proximity to the arc to be ruptured, and also to coat or cover the electrodes themselves with insulating material at parts outside of the magnetic field, so that any possibility of a discharge or arc forming at any other portion of the conductors than those directly included in the magnetic field may be avoided."

The six claims which are said to have been infringed, and the validity of which only are to be considered, are as follows:

"(1) In an arc-rupturing device, a shield of insulating material located between the surfaces of the electrodes and the adjacent conducting surfaces of the device by which the arc is disrupted, as and for the purpose described. (2) An arc-rupturing device having its exposed surfaces adjacent to surfaces of the arcing electrodes or bodies shielded with insulating material. (3) The combination, with electrodes liable to abnormal arcing, of an arc-dispelling magnet and a shield of insulating material between opposed surfaces of the magnet and electrodes, as and for the purpose described. (4) In an arc-rupturing device, a magnet whose poles are covered with insulating shields. (5) In an arc-rupturing device, an intercepting shield of solid insulator between the poles of an arc-rupturing magnet and the arcing electrodes. (6) In an arc-rupturing device, magnet portions shielded by an insulating covering, in combination with shielded electrodes having an exposed metal portion wholly within the space within the magnet poles."

There is no doubt that the improvement caused by the insulation described was novel, in that it had not been used before the date of the invention upon arc-rupturing devices of the character mentioned in the patent, was also useful, and that, in connection with other inventions of the same patentee resulting in an automatic circuit breaker, it has been of great value. The question upon the patent is that of patentability.

The thing to be accomplished was to retain the arc in the field

of the magnet; that is, to prevent discharges from the electrodes or other portions of the conductors which might escape the rupturing action of the magnet. The mechanical means are simply insulation of the poles of the magnet or of the electrodes or of both. The invention is summed up in claim 4 as: "In an arc-rupturing device, a magnet whose poles are covered with insulating shields." The use of insulation for the purpose of preventing the injurious escape of a current of electricity, the mechanical means which the patentee employed, and the ordinary result of insulation were all familiar to the public at the date of the invention, and there was nothing new in the conception of the idea that the way to prevent lateral discharges between conductors was by the interposition of insulation. The complainant insists, however, that the invention consisted in a new location and in a new object, viz. to prevent the arc from escaping, and to assist the arc-rupturing device by preventing the arc from forming in a new situation, and by keeping it located in the path which is needed for its destruction. This mode of expression merely repeats, with more formality, the idea which the patentee had conveyed in his patent, to the effect that by insulation discharges are prevented which might escape the action of the magnet. The object is the old object, and the result is simply the old result of insulation, which is to prevent discharges at an injurious place. The fact that insulation of the poles of the magnet allows their close approach to the electrodes, and thereby enhances the intensity of the field, is a result which was incidental to the main object of the invention; for, after insulation had stopped the danger of lateral discharges from electrodes, the magnet could then be pushed more closely to them. The circuit court was of opinion that the use of insulation, at and in combination with the separated electrodes and the magnetic field, to control the arc during dispersion, possessed patentable novelty. We cannot perceive that the effect of the insulation in an arc-rupturing device was anything more than the old effect, which had always accompanied insulation, and which was accomplished by the old mechanical means, although it was used to prevent lateral discharges in connection with an arc-rupturing device.

The invention of claim 6 does not differ in patentable character from that of the preceding claims, though it is stated more elaborately, and calls for shielded portions of the magnet and shielded electrodes, so that the exposed metallic portion shall be wholly within the space between the magnet poles. It is the combination which the patentee had declared in his specification he thought it desirable to use. The decree of the circuit court for the Eastern district of New York upon patent No. 283,167 is affirmed, with costs.

So much of the decree of the circuit court for the Southern district of New York as relates to patent No. 283,167 is affirmed, and so much of the decree as relates to patent No. 401,085 is reversed, with costs of this court to the defendants, and the case is remanded to that court, with instructions to enter a decree dismissing the bill, with costs of that court.